UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:19-cr-34-01 |
| Plaintiff, | Hon. Paul L. Maloney |
| v. | United States District Judge |
| MICHAEL PAUL ASH, | |
| Defendant. | |

_____/

## DEFENDANT MICHAEL PAUL ASH'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE

Michael Paul Ash ("Mr. Ash") is scheduled to appear before this Court for sentencing on December 9, 2019 at 2:30 P.M. Earlier this year, on July 25, 2019, Mr. Ash appeared before United States Magistrate Judge Ellen S. Carmody, before whom he pled guilty to Counts One through Three of the Indictment. Counts One and Two charged Mr. Ash with felon in possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2). Count Three charged Mr. Ash with Possession with Intent to Distribute Five Grams of More of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(2)(B)(viii). The Honorable Paul Maloney accepted Mr. Ash's plea and adjudicated him guilty. The preparation of a Presentence Investigation Report ("PSR") was ordered.

Mr. Ash now stands before this Court as a purported "career offender" with a Total Offense Level of 31 and Criminal History Category of VI, resulting in an advisory Sentencing Guideline imprisonment range of 188 to 235 months. In addition to the arguments raised pursuant to the Sixth Circuit's recent *en banc* decision *in United States v. Havis*, which calls into question Mr. Ash's

purported career offender status, there are several other compelling reasons why a below guidelines sentence is appropriate here.

Regardless of the Court's resolution of Mr. Ash's *Havis* argument, we respectfully ask the Court to grant Mr. Ash's request for a downward variance, as any sentence within the guidelines would be far greater than necessary to achieve the statutory purposes of sentencing.

**SENTENCING CONSIDERATIONS**

Pursuant to 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." As such, Mr. Ash respectfully requests that this Court exercise its discretion to consider all of the factors contained in 18 U.S.C. § 3553(a) when determining his sentence—not just the advisory Sentencing Guidelines. *See United States v. Maddalena*, 893 F.2d 815, 818 (6th Cir. 1989) (remanding for the District Court to consider the defendant's mitigating circumstances, in light of the District Court's discretion to deviate from the Guidelines). In addition to the Guidelines, 18 U.S.C. § 3553(a) requires the Court to consider the following factors in imposing a sentence: the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed, the kinds of sentences available, any pertinent policy statement, the need to avoid unwanted sentence disparities among defendants with similar records, and the need to provide restitution to any victims of the offense.

Given Mr. Ash's history, characteristics, and the circumstances surrounding the offense, the draconian range of incarceration as set forth in the Presentence Investigative Report is far greater than necessary to achieve the statutory purposes of sentencing. Accordingly, Mr. Ash

respectfully submits this Sentencing Memorandum and asks the Court to consider the following information when imposing his sentence.

## I.        Mr. Ash's History and Characteristics

Mr. Ash, age 49, was born in Niles, Michigan on March 31, 1970. (PSR 20) He is the oldest of two children born to Larry Ash and Francine Sykes. (PSR 20). Mr. Ash's parents divorced when he was 3 years old. (PSR 20). Mr. Ash believes that as a bi-racial child, racial tension caused his parents' marriage to dissolve. (PSR 20). Following the divorce, his father was not very involved in Mr. Ash's life. (PSR 20). Thankfully, Mr. Ash has a close relationship with his mother who raised him and his sister as a single mother. (PSR 20). Mr. Ash also has a good relationship with his sister, Sheila Ash, with whom he communicates with every other month. (PSR 20).

Mr. Ash's mother did the best she could to raise her two children single handedly. (PSR 20). She worked during the day and attended college in the evening, but always made sure that dinner was ready for her children. (PSR 20). Her absence accounted for several instances where her children were left home alone. (PSR 20). During his childhood, Mr. Ash's mother had a live-in boyfriend who was a good guy and treated Mr. Ash and his sister well. (PSR 21). However, the boyfriend was not a "kid" person and was an alcoholic. (PSR 21). This relationship only lasted a few years. (PSR 21). Mr. Ash's mother later married William Sykes, a prosecuting attorney in Kalamazoo. (PSR 21). Mr. Ash had a great relationship with his step-father and considered him more of a dad than his biological father. (PSR 21). Mr. Ash referred to Mr. Sykes as "dad" and Mr. Sykes always did his best to help Mr. Ash. (PSR 21). Mr. Ash and his mother continue to have a good relationship and speak on a weekly basis. (PSR 20). Although Mr. Ash's mother is disappointed with Mr. Ash, she is still very supportive of him. Mr. Ash considers his mother his rock and states that she has been throughout his entire life. (PSR 22).

Mr. Ash hardly saw his father until he was around 12 or 13 years old. (PSR 20). Around that time, he began to stay with his father on the weekends. (PSR 20). However, his father made Mr. Ash several "empty promises" growing up, which lead to Mr. Ash not having an emotional relationship with him. (PSR 20). Mr. Ash does not refer to his father as dad, but rather calls him "Larry." (PSR 20). To this day, he only speaks with his father a couple of times per year. (PSR 20). Mr. Ash's father remarried Mr. Ash's step mother, Cathy Ash. (PSR 20). Mr. Ash has always gotten along with Cathy Ash and she is still supportive of him.

There was an instance during Mr. Ash's childhood where his mother attempted to discipline him after he had been drinking. (PSR 21). Mr. Ash would not listen to his mother, so she hit him and got Mr. Ash's father involved. (PSR 21). Mr. Ash's father struck Mr. Ash hard in the chest. (PSR 21). Because this led to Mr. Ash not being able to play in a school basketball game, the school contacted Child Protective Services (CPS). (PSR 21). Mr. Ash resented his father at that time because he was not in his life, but attempted to tell him what to do. (PSR 21).

Growing up, Mr. Ash had a normal childhood through middle school. (PSR 21). He was involved in sports, enjoyed fishing and boating with his family, and attended mass at a Catholic church. (PSR 21). He recalls trips with his family to Great America, Cedar Point, and Colorado. (PSR 21). He was well-behaved at home and performed well academically. (PSR 21). Things began to change when Mr. Ash got to high school. (PSR 21). Mr. Ash struggled to fit in as a bi-racial child in a predominately-Caucasian neighborhood, which led to his fall to peer pressure and experimentation with alcohol and marijuana at age 14. (PSR 21). Mr. Ash excelled at basketball and could have gotten a scholarship for it. (PSR 21). Unfortunately, Mr. Ash associated with the wrong crowd and dropped out of high school. (PSR 21).

Mr. Ash has never been married, but he has been in an off-and-on romantic relationship with Christine Cunic ("Ms. Cunic") since 2011. (PSR 21). Mr. Ash and Ms. Cunic share one minor child, M.A., who is in good health and is currently 6 years old. (PSR 21). Ms. Cunic has three other children, ranging in age from 16 to 7. Mr. Ash loves these children and considers them his own. (PSR 22). Mr. Ash has been in the youngest child's life since he was 6 months old, and he refers to Mr. Ash as "poppa." (PSR 22).

Mr. Ash has a great relationship with his biological son, M.A. Michael lived with Mr. Ash up until his recent incarceration. Due to his incarceration, Mr. Ash's mother obtained guardianship of his son and his son is currently living with her and Ms. Cunic. (PSR 22). Mr. Ash is unsure about the status of his relationship with Ms. Cunic, but she has been in frequent communication with him and has supported him during his incarceration. Mr. Ash believes that Ms. Cunic is a great mother and that they had a good relationship until their drug use got the best of them. (PSR 21).

Mr. Ash enjoys spending his free time with M.A. (PSR 22). Mr. Ash took his son to bounce houses, trampoline parks, sledding, playgrounds, walks, and out for pizza. (PSR 22). Mr. Ash likes to do everything he can with Michael. Mr. Ash also enjoys fishing, exercising, collecting coins and working on cars. (PSR 22). He is an electrician by trade and is skilled at fixing things. (PSR 22). Mr. Ash is very social. He is charming and a good conversationalist. (PSR 22). To Mr. Ash "life is about people and the memories of what you have here are all you have." (PSR 22).

Mr. Ash's proudest accomplishment was integrating back into society after being released from prison and becoming a manager for a company. (PSR 22). This was his first white collar job and he was entrusted with a company vehicle, telephone, and computer. (PSR 22). Additionally, during his incarceration, Mr. Ash decided to better his education. On November 15, 2019, Mr. Ash

completed his high school degree.[1] Mr. Ash's goals are to become a productive member of society and raise his son. Mr. Ash has been a model inmate at the Newaygo County Jail; he has not presented any management issues during his incarceration. (PSR 4). Mr. Ash is ready to turn his life around and looks forward to the opportunity to reintegrate into society.

## II.        Nature and Circumstances of the Offense

Mr. Ash pled guilty to two counts of Felon in Possession of a Firearm and one count of Possession with Intent to Distribute Methamphetamine. (PSR 3). These charges are a direct result of Mr. Ash's addiction to drugs. Mr. Ash believes that his most destructive character trait is that he has an addictive personality. (PSR 22). He goes from zero to 100 and is "all in." (PSR 22). This character trait has had devastating consequences on Mr. Ash's life and played a significant role in Mr. Ash's actions preceding his conviction.

Mr. Ash began using alcohol and marijuana at the young age of 14. (PSR 21). His use of these substances led to Mr. Ash's first run-ins with the law. (PSR 21). The combination of his addictive personality and his poor social circle led to his involvement in the instant offenses. Mr. Ash's girlfriend, Ms. Cunic, is also a recovering drug addict. (PSR 22). She is currently on probation for possession of methamphetamine. (PSR 22). In January 2018, Mr. Ash decided to try Ms. Cunic's drug of choice, methamphetamine, for the first time. (PSR 22). Shortly thereafter, he became addicted and things downward spiraled. Mr. Ash lost his job, home, and vehicle by February 2018. (PSR 22). Mr. Ash's substance use also interfered with his relationship with Ms. Cunic and led him to buy, sell, and use drugs to sustain his habit. (PSR 24-25).

In December 2018, Mr. Ash was pulled over for failing to use a traffic signal. (PSR 4). During the stop, Mr. Ash informed officers that there was a warrant for his arrest and complied

---

[1] See Exhibit __ which contains a photograph of Mr. Ash in his cap and gown and a copy of his high school diploma.

with the officer's request to get out of the vehicle. (PRS 4). Mr. Ash gave the officer permission to search his vehicle and the officer located a Jennings .22 caliber semi-automatic handgun. (PSR 4). Mr. Ash admitted that he had bought the gun and carried it on his person for protection. (PSR 5).

On January 14, 2019, police officers once again pulled over Mr. Ash. (PSR 5). Mr. Ash fled on foot and removed a Ruger .45 caliber semi-automatic handgun from his person and dropped it on the ground. (PSR 6). Police officers apprehended Mr. Ash and found the weapon. (PSR 6). Mr. Ash was taken into custody. (PSR 6). Mr. Ash was very forthcoming with police upon his arrest. (PSR 6). He informed law enforcement that he fled police because he had a handgun in his possession. (PSR 6). Mr. Ash stated that he knew he was not supposed to carry a handgun. However, he also stated that he only carried the handgun on his person because he sells narcotics and often had money and drugs on his person. (PRS 6). Mr. Ash was released on bond on January 27, 2019. (PSR 6). While on bond, Mr. Ash let his addiction get the best of him and continued to use methamphetamines. (PSR 7).

On February 22, 2019, officers located Mr. Ash at a McDonald's and arrested him pursuant to a federal weapons offense warrant. (PSR 7). Officers searched Mr. Ash and located 14 grams of methamphetamines on his person. (PSR 7). Mr. Ash was taken to Newaygo County Jail and has been housed there since his arrest.

At the time of his arrest, Mr. Ash was using drugs and broke; he was trying to get money to support his habit. (PSR 8). Mr. Ash's involvement in the drug scene was not significant. He was not a kingpin or a ringleader, but rather he played middleman for a bigger dealer. (PSR 8). He only bought and sold drugs to feed his personal habit. During all of his encounters with law enforcement, Mr. Ash cooperated and never denied culpability. Mr. Ash admits that he "allowed

[his] addiction to continue to push [him] to make bad choices for [him] and [his] family." (PSR 8). He further admits that he "let [his] family down again and [has] left [his] son without a parent to be raised by [his] 68 year old mother." (PSR 8). He states that he has "let everyone down, including [himself]." (PSR 8). Mr. Ash recognizes the significance of this crime and understands the pain that he has caused his family and the danger his involvement in the drug scene had on the community. Mr. Ash understands that he will likely spend some time incarcerated for his involvement in this offense. During that period of incarceration, Mr. Ash plans to focus on sobriety, parenting, and mending family ties. Mr. Ash previously successfully integrated back into society after a stint in prison, including maintaining a white-collar job and raising 4 children (1 biological and 3 of Ms. Cunic's). (PSR 9). After he is released from custody, Mr. Ash plans to once again successfully reintegrate into society, regain meaningful employment, make up lost time with his son and stepchildren, and never stand before this court as a defendant again. (PSR 9).

### III.    The Purposes of Sentencing.

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), and as clarified further in *Gall v. United States*, 128 S. Ct. 586 (2007) and *Kimbrough v. United States*, 552 U.S. 85 (2007), the court must impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing. *United States v. Foreman*, 436 F.3d 638 (6th Cir. 2006). The Guidelines, as one of the statutory factors, must be considered in fashioning an appropriate sentence. 18 U.S.C. § 3553(a)(4),(5). But, the Guidelines alone do not necessarily establish even a presumptively reasonable sentencing range in a particular case. *Rita v. United States*, 127 S. Ct. 2456 (2007).  In Mr. Ash's case, the current Guidelines score is far greater than necessary to achieve the purposes of sentencing.

1. *The Need for the Sentence Imposed to Reflect the Seriousness of the Offense.*

Mr. Ash recognizes the seriousness of his offense. (PSR 8). He understands that his addiction issues and associations with the wrong crowd led to his involvement in dealing methamphetamines. He acknowledges that his actions violated federal law and were harmful to himself, his family, and the community. (PSR 8). In recognition of this fact, he has fully cooperated with law enforcement and the government on numerous occasions. (PSR 8). Mr. Ash admits that what he did was wrong. (PSR 8). He takes full responsibility for his actions, and wants to work diligently to focus on his sobriety, attend meetings, change his peer associations, and make up time with his son. (PSR 9). Mr. Ash recognizes and admits that he "allowed [his] addiction to continue to push [him] to make bad choices for [him] and [his] family." (PSR 8). A sentence within his advisory guideline range of 188 to 235 months is simply not necessary to adequately reflect the seriousness of his criminal behavior.

2. *The Need to Afford Adequate Deterrence to Criminal Conduct.*

Mr. Ash was arrested and brought into custody on February 22, 2019. Since that time, he has remained in the Newaygo County Jail, unable to spend time with his family, search for suitable employment, or contribute to society. Mr. Ash has consistently expressed remorse for his actions and has come up with proactive steps he will take to change his life. (PSR 8). Mr. Ash realizes that his addiction to methamphetamines has negatively affected every area of his life, his family's lives, and members of the community. (PSR 8) Most importantly, his absence due to his actions has led to his mother taking over guardianship of his minor child. (PSR 8). The shame and remorse he feels for letting his criminal behavior destroy his life and traumatically affect his family is, in and of itself, an adequate deterrent that will successfully help prevent Mr. Ash from using drugs and re-engaging in criminal activity again.

On top of that, most of Mr. Ash's past criminal behavior comes from his addiction to drugs and involvement in the drug culture. Mr. Ash has shown that when he remains clean, he transforms into a productive member of society as he held a manager position at a white-collar job. (PSR 22). Additionally, as Mr. Ash has been incarcerated since February 22, 2019, he has maintained his sobriety for 9 months. If Mr. Ash receives adequate substance abuse treatment and continues to engage fully in his recovery, he will be set for success. Accordingly, Mr. Ash respectfully suggests that a sentence well below his advisory Guidelines will be adequate to deter both Mr. Ash and others considering engaging in similar conduct.

3. *No Need to Protect the Public from Further Crimes: Mr. Ash has Expressed the Willingness to Become a Productive, Law-Abiding Citizen, and has Expressed Deep Remorse for His Actions.*

Mr. Ash fully understands that what he did was wrong, and he has no intention of ever returning to a criminal lifestyle fueled by illegal substances. Mr. Ash does not stand in front of this court for a violent offense. Instead, Mr. Ash's criminal behavior reflects an individual struggling with addiction. Additionally, although he was aware that he should not possess a firearm, Mr. Ash only carried the firearms for protection. (PSR 5).

Furthermore, Mr. Ash wants to maintain sobriety, gain beneficial employment, and reunite with his family, particularly his son. Mr. Ash is willing to accept and participate in drug rehabilitation programs to help set him up for success in maintaining his sobriety. In fact, Mr. Ash welcomes and asks for this opportunity.

Mr. Ash realizes how his drug addiction and criminal actions have affected his loved ones. Mr. Ash admits that he "allowed [his] addiction to continue to push [him] to make bad choices for [him] and [his] family." (PRS 8). He further admits that he "let [his] family down again and [has] left [his] son without a parent to be raised by [his] 68 year old mother." (PSR 8). He states that

he's "let everyone down, including [himself]." (PSR 8). Certainly, Mr. Ash feels the utmost remorse for his actions. Mr. Ash is motivated to turn his life around and become the best version of himself and the best father he can be, free from drugs and crime. Mr. Ash realizes how his drug addiction and criminal actions have affected his loved ones. Mr. Ash is motivated to turn his life around and battle his drug addiction head on.

4.  *The Need to Provide the Defendant with Needed Training, Care, or Treatment.*

As Mr. Ash has been incarcerated for the past 9 months, he is finally free from the effects of methamphetamine. Mr. Ash wishes to remain this way and realizes he needs to focus on treatment and be active in his recovery. Accordingly, Mr. Ash would ask this Court to recommend any drug rehabilitation programs available to him. He is committed to receiving substance abuse counseling, obtaining the necessary treatment, and successfully overcoming his struggle to beat his addiction. With drug treatment, Mr. Ash will be set up for success, and will be able to reintegrate into the community drug free with the love and support of his family.

While Mr. Ash does not necessarily require any additional educational or vocational training in order to be a contributing member of society after his release from custody, Mr. Ash has sought and will continue to seek every opportunity he has available to him. (*Id.*) Indeed, Mr. Ash has proven his dedication to transforming himself into a productive, law-abiding citizen pending his sentencing in this matter. On November 15, 2019, Mr. Ash completed his high school degree. He is ready and willing to participate in any additional educational or vocational training offered. Therefore, Mr. Ash also asks that this Court recommend any vocational training and/or programing available. This will further help Mr. Ash transition back into society in a positive way.

While drug treatment and other programing will be important and beneficial for Mr. Ash, a sentence well below his advisory Guidelines would give him plenty of time to successfully

recover from his addiction and allow him to participate in programs to give him the tools to succeed as a law-abiding citizen. Mr. Ash looks forward to completing his sentence and contributing to society.

    5.  *Need to Avoid Unwarranted Sentencing Disparity.*

Courts should seek to promote uniformity of sentencing by treating similarly-situated defendants in a similar manner, but may impose unequal sentences where the particular circumstances warrant the disparity. *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007); *United States v. Marcial-Santiago*, 447 F.3d 715, 719 (9th Cir. 2006). Discrepancies between individuals who commit the same violation are warranted if they are based on the differences between the individuals and their offenses.

Here, Mr. Ash's crimes were the direct result of his drug addiction, not of a criminally deviant mind. Additionally, the circumstances behind Mr. Ash's involvement in the offense warrant a different sentence for him as opposed to others with a greater involvement in the drug scene. Mr. Ash's involvement in the drug scene was minimal and minor. (PSR 8). He played a middleman for a bigger dealer and only participated in buying and selling to feed his personal habit. (PSR 8). However, Mr. Ash's Guidelines could result in him receiving a stiff sentence of 188 to 235 months in prison. Mr. Ash is fully committed to turning his life around and beating his addiction, which warrants recognition in terms of his sentence.

    6.  *Need to Provide Restitution to Any Victims of the Offense.*

Restitution is not applicable in this case.

### OBJECTION TO THE GUIDELINES CALCULATION

Mr. Ash objects to one component of his Sentencing Guidelines calculation. In particular, Mr. Ash believes that he should not be scored as a career offender in light of the Sixth Circuit's unanimous, *en banc* decision in *United States v. Havis*, 927 F.3d 382 (6th Cir.), *reconsideration den.*, 929 F.3d 317 (6th Cir. 2019).

*Havis* stands for the proposition that delivery of a controlled substance under Michigan law does not constitute a controlled substance offense as defined in U.S.S.G. § 4B1.2. *Id.* at 387. *Havis*'s major holding is that attempt crimes do not qualify as controlled substance offenses under the Guidelines. *Id.* Specifically, the Sixth Circuit held that Application Note 1 to § 4B1.2(b)—which purports to expand the definition of a "controlled substance offense"—is an unconstitutional use of the Sentencing Commission's authority and invalid.

Under § 4B1.2(b), "[t]he term 'controlled substance offense' means an offense . . . that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." Application Note 1 to § 4B1.2(b) expands this definition to "include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." U.S.S.G. § 4B1.2 comment. n. 1. However, the Sixth Circuit's *en banc* ruling in *Havis* held that this Application Note added to, rather than interpreted § 4B1.2, and is thus invalid. *Havis*, 927 F.3d at 386-87.

Because the Sentencing Commission has "both quasi-legislative and quasi-judicial power" it is constitutional only because of two constraints. *Id.* at 385. First, Congress "reviews each guideline before it takes effect." *Id.* Second, the Guidelines are "subject to the notice and comment requirements of the Administrative Procedure Act." *Id.* "These two constraints—congressional

review and notice and comment—stand to safeguard the Commission from uniting legislative and judicial authority in violation of the separation of powers." *Id.* at 385-86. Differently, the commentary to the Guidelines is not subject to either constraint. *Id.* at 386. Accordingly, the commentary is constitutional only because it "has no independent legal force—it serves only to *interpret* the Guidelines' text, not to replace or modify it." *Id.* (emphasis in original).

Applying these principles to § 4B1.2(b), the Sixth Circuit held that Application Note 1 impermissibly expanded the definition of "controlled substance offense" by including attempts: "To make attempt crimes a part of § 4B1.2(b), the Commission did not interpret a term in the guideline itself—no term in § 4B1.2(b) would bear that construction. Rather, the Commission used Application Note 1 to *add* an offense not listed in the guideline." *Id.* Thus, Application Note 1 has no force, and the text of § 4B1.2(b) is determinative.

In light of this holding, the Sixth Circuit, in *Havis*, held that the defendant's conviction for sale/delivery of cocaine under Tennessee law was not a controlled substance offense. *Havis*, 927 F.3d at 387. This was because Tennessee law defines "delivery" to mean "the actual, constructive, or *attempted* transfer from one person to another of a controlled substance." *Id.* at 384 (citing Tenn. Code Ann. § 39-17-402(6)) (emphasis in original).[2] Accordingly, under the categorical approach, the court "look[ed] to the *least of the acts criminalized* by the elements of that statute" to see if they fell within the guidelines' definition. *Id.* (emphasis in original). Because the defendant could have been convicted of delivery with a mere attempt to deliver, his conviction for delivery was the categorical equivalent of a conviction for attempted delivery. Additionally, the Shepard "documents did not specify whether his conviction was for sale, delivery, or both." *Id.* Thus, the

---

[2] Tenn. Code Ann. § 39-17-402(6).

defendant's conviction for sale/delivery of cocaine was not a controlled substance offense under the guidelines. *Id.* at 387.

Mr. Ash's case is legally indistinguishable from *Havis*. One of the predicate offense relied upon to categorize him as a career offender is a conviction for Delivery/Manufacturing. The Shepard documents in his case do not reveal whether he was convicted of manufacture, delivery, or both.[3]  Thus, his conviction qualifies as a controlled substance offense only if the least culpable conduct falls within that definition. *Havis*, 927 F.3d at 384. Like Tennessee, Michigan defines deliveries to include attempted deliveries. The definition of "delivery" for Mich. Comp. Law § 333.7401 includes the "attempted transfer from 1 person to another of a controlled substance . . . ." Mich. Comp. Law § 333.7105(1).[4] Thus, under the categorical approach, in Michigan, delivery constitutes attempted delivery. As a result, Mr. Ash's delivery convictions are not controlled substance offense under the guidelines after *Havis*. Accordingly, his delivery conviction may not be used as a predicate offense to classify him as a career offender and score him as such under the guidelines.

      **a.  An Argument that a Conviction for Delivery of a Controlled Substance Under Michigan Constitutes a Controlled Substance Offense Under the Guidelines Ignores Michigan law.**

Based on its expressed position, counsel anticipates that the government will dispute that delivery of a controlled substance under Michigan law includes attempted deliveries. Specifically, counsel believes that the government will urge this Court to adopt the theory presented in Judge Sutton's opinion concurring in the denial of rehearing in *United States v. Havis,* 929 F.3d 317 (6th

---

[3] Although the factual basis for Mr. Ash's Delivery/Manufacturing charge laid out in Paragraph 58 of the PSR indicates that Mr. Ash's charge was for delivery of a controlled substance—not manufacture.

[4] Mich. Comp. Law § 333.7105(1).

Cir. 2019).[5] For the reasons stated below, this argument ignores Michigan law and should be rejected.

After *Havis*, it is undisputed that attempt crimes are not "controlled substance offenses" under the guidelines. Likewise, it is undisputed that if Michigan delivery criminalizes attempted delivery, a conviction for Michigan delivery is also not a controlled substance offense. However, despite the fact that Michigan defines delivery to include "attempted transfer," the government will likely argue that Michigan delivery does not include attempted delivery.

The government has previously based its argument on a purported "difference between the offense of distribution of drugs by attempting to transfer drugs and the separate offense of attempted distribution." In Judge Sutton's words, these "two constitute distinct offenses, one greater and one lesser, one complete and one attempted." *Havis*, 929 F.3d at 319.  Judge Sutton's concurrence argues that this distinction exists in federal law, and notes that it could apply to Tennessee law as well. *Id.* at 320.

However, it is Michigan law that controls this question, not federal law or Tennessee law. Under the categorical approach, federal courts are bound by state courts' interpretation of state statutes. *Johnson v. United States*, 559 U.S. 133, 138 (2010). And, Michigan courts have rejected interpreting Michigan law according to Judge Sutton's theory.

---

[5] *Havis* has a complicated procedural history.  Initially, the panel affirmed the defendant's sentence.  Although all three judges agreed with the defendant's arguments, two of the judges believed that the Sixth Circuit's prior precedent required them to affirm the sentence. *United States v. Havis*, 907 F.3d 439, 442–44 (6th Cir. 2018).  The defendant then moved for *en banc* rehearing, which the court granted.  The court overturned its prior decision, issuing the unanimous, per curiam opinion that the defendant relies on.  *United States v. Havis*, 927 F.3d 382, 386–87 (6th Cir. 2019) (*en banc*) (per curiam).  Subsequently, the government moved for a second rehearing.  The court denied the government's motion, and Judge Sutton filed his opinion concurring in the denial of rehearing.  *United States v. Havis*, 929 F.3d 317 (6th Cir. 2019).  No other judge joined in Judge Sutton's opinion.

Instead, Michigan courts have consistently held that attempted delivery is not a separate crime, but rather a means to commit delivery under Michigan law. For example, in *People v. Wright*, 74 Mich. App. 297, 301 (1977), the defendant was charged with delivery of heroin. At trial, he asked the court to also instruct the jury on attempted delivery of heroin. *Id.* The trial court declined to do so, and the Court of Appeals of Michigan affirmed. The court held that "there can be no crime of 'attempted delivery of heroin' in Michigan." *Id.* Rather, because the Michigan Controlled Substances Act "defines 'delivery' as 'the actual, constructive or attempted transfer from 1 person to another of a controlled substance,'" the legislature "merge[d] attempt with the completed offense." *Id.*

Likewise, in *Wayne Cty. Prosecutor v. Detroit Recorder's Court Judge*, 177 Mich. App. 762, 764 (1989), the court held that "under the controlled substances act, there is no such offense as 'attempted delivery of cocaine.' Any attempt is subsumed under the crime of delivery itself." Similarly, in *People v. Alexander*, 188 Mich. App. 96, 99 (1991), the court held "an attempt is subsumed under the crime of delivery itself, and there is no separate offense of attempted delivery of cocaine."

Thus, under Michigan law, attempted delivery and delivery are not two "distinct offenses, one greater and one lesser, one complete and one attempted." *Havis,* 929 F.3d 317 (Sutton, J., concurring). Rather, attempted delivery is one means of committing delivery.

The categorical approach requires courts to assume that a conviction is based upon the least of the acts criminalized. *Moncrieffe v. Holder*, 569 U.S. 184, 190–91 (2013). Thus, in Michigan, delivery of controlled substances is categorically attempted delivery of a controlled substance. Because it is undisputed that attempts are not controlled substance offenses under the guidelines,

convictions for delivery of a controlled substance under Mich. Comp. Laws § 333.7401 are likewise not controlled substance offenses.

Counsel also anticipates that the government will argue that *People v. Wright* and its progeny are no longer good law. Specifically, the government has previously argued that the Michigan legislature overturned this line of cases by enacting Mich. Comp. Laws § 333.7407a, which provides a harsher penalty for attempts to violate controlled substance offenses.[6]  However, no Michigan law supports this argument.

First, this argument lacks common sense. *Wright* held that it was the definition of "'delivery' as 'the actual, constructive or attempted transfer from 1 person to another of a controlled substance,'" that "merge[s] attempt with the completed offense." 74 Mich. App. 301. This definition has not changed; Michigan still defines delivery as "the actual, constructive, or attempted transfer from 1 person to another of a controlled substance." Mich. Comp. Laws § 333.7105(a). Thus, *Wright*'s holding that this definition subsumes attempt into a complete delivery remains unchanged.

Second, the government failed to cite any Michigan case supporting its theory, and counsel has found none that does.  Mich. Comp. Laws § 333.7407a was enacted in 1994. 1994 Mich. Legis. Serv. P.A. 220 (H.B. 4237). In the 25 years since it has been enacted, no Michigan court has held that it changed the law on attempted deliveries so that they are no longer subsumed into completed deliveries.

---

[6] Under Michigan's general attempt statute, the punishment for an attempted crime is lower than the punishment for the completed crime.  *See* Mich. Comp. Laws § 750.92.  Under Mich. Comp. Laws § 333.7407a, attempts to commit offenses under Mich. Comp. Laws Ch. 333, Art. 7, Pt. 74 (i.e. controlled substance offenses), are punished with the same penalties as the completed offenses.

Indeed, Michigan courts continue to instruct juries that delivery subsumes the offense of attempted delivery. (*See* M. Crim. J.I. 12.2, Unlawful Delivery of a Controlled Substance.) The Michigan Model Criminal Jury Instruction for delivery of a controlled substance—most recently amended in 2018—instructs the jury that a legal attempt is sufficient for a delivery conviction; it allows the jury to convict the defendant if he intended to deliver a controlled substance and took some action towards this goal. *Id.* And, the notes for this instruction state "[b]ecause the statutory definition of delivery includes actual, constructive, or attempted transfer of a substance, attempted delivery is not a lesser included offense. MCL 333.7105(1)." *Id.*

Thus, the government's argument that Mich. Comp. Laws § 333.7407a overturns Michigan's case law on attempted deliveries lacks any support under Michigan law. Michigan courts continue to instruct juries that they may convict a defendant for delivery of a controlled substance if they find that the defendant attempted to deliver a controlled substance. Accordingly, under the categorical approach, a conviction for delivery of a controlled substance under Mich. Comp. Laws § 333.7401 is a conviction for attempted delivery and thus not a controlled substance offense under the guidelines.

In this case, Mr. Ash's prior delivery convictions are not controlled-substance offenses under the Guidelines after *Havis*. Accordingly, his prior delivery convictions may not be used as predicate offenses to classify him as a career offender and score him as such under the Guidelines.

The effects of this scoring error are significant. Mr. Ash should not be considered a career offender. His Adjusted Offense Level should not have been increased to 34. Without the career offender enhancement, Mr. Ash's Adjusted Offense Level would be 30. After receiving a three point decrease for acceptance of responsibility, Mr. Ash's Total Offense Level should be 27. Accordingly, Paragraph 47 should reflect a Total Offense Level of 27. Additionally, Mr. Ash's

Criminal History Category should remain at IV. Paragraph 63, which increases Mr. Ash's Criminal History Category to VI in light of his categorization as a career offender, should be removed. Using the accurate Total Offense Level of 27 and the correct Criminal History Category of IV would make the guideline imprisonment range 100 to 125 months.

**REQUEST FOR DOWNWARD VARIANCE**

Following the decision in *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, the Sentencing Guidelines are treated as merely advisory, and a district court is directed to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of the Sentencing Reform Act, 18 U.S.C. § 3553(a). The Act's purposes include reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment, deterrence, and protection to the public. 18 U.S.C. § 3553(a)(2).

Therefore, a court's authority to impose a variance, is discretionary and stems from both the advisory nature of the Guidelines and the factors set forth in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 49-50 (2007) (requiring judge to "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party," to "make an individualized assessment based on the facts presented," and to refrain from presuming that the Guideline range is reasonable or treating the Guidelines as mandatory); *see also United States v. Stephens*, 549 F.3d 459, 466-67 (6th Cir. 2008) (explaining that a sentencing court has different, broader authority to vary from the suggested Guideline range based on the § 3553(a) factors than to depart from it based on § 5 of the Guidelines). In this case, there are several bases supporting a variance below the advisory Guidelines range.

A sentence far below the advisory Guideline range would be entirely adequate to deter this type of criminal conduct and communicate to Mr. Ash, and to the public, the seriousness of this

offense. Mr. Ash poses no serious threat to the community and has already shown his willingness to be a productive, law-abiding citizen during his current incarceration pending sentencing for this offense. The sentence recommended by the PSR writer—188 to 235 months—is draconian in the context of Mr. Ash's life, role in the offense, drug addiction, and criminal activity.  In the context of the acceptance and cooperation Mr. Ash has shown, such a sentence would clearly be far greater than necessary to achieve the goals of sentencing.

In fact, even the 100 to 125 month Guidelines range that results from sustaining Mr. Ash's objection is far greater than necessary to achieve the sentencing goals. A variance is appropriate here because, as discussed above, Mr. Ash is not a dangerous criminal who cannot be rehabilitated without serious time spent in incarceration. Although he has made mistakes in his life, Mr. Ash has openly admitted these mistakes, taken responsibility for them, and wants to forge ahead with the rest of his life. Mr. Ash feels the utmost remorse for what he has done, and he is determined to obtain and maintain sobriety to ensure that this type of criminal activity is never something he engages in again. Mr. Ash is willing to work hard to stay clean and beat his addiction.

Therefore, a significant custodial sentence is simply unnecessary in this case to sufficiently punish Mr. Ash. Accordingly, Mr. Ash respectfully requests that this Court sentence him to a period of incarceration significantly below the Guidelines.

## CONCLUSION

Mr. Ash has accepted full responsibility for the decision he made resulting in his conviction. He wants nothing more than to turn his life around, maintain sobriety, provide for his son, and contribute to society. Mr. Ash has the support of his family to ensure this is the last time he will ever be before this Court as a criminal defendant. Mr. Ash respectfully requests that this Honorable Court issue a sentence below 100 to 125 months.

Respectfully submitted,

WARNER NORCROSS + JUDD LLP

Dated:  December 2, 2019

By:    s/C. Ryan Grondzik
        C. Ryan Grondzik (P75526)
        1500 Warner Building
        150 Ottawa Ave. NW
        Grand Rapids, Michigan 49503
        616.752.2000
        rgrondzik@wnj.com